Theora L. FORESTEL, widow of William M. Forestel, Individually, and for the Use and Benefit of her minor children, Jeffery E. Forestel, Ann T. Forestel, Jean M. Forestel and James P. Forestel, Plaintiffs,

v.

The UNITED STATES of America, Dr. John Doe and the A. B. C. Insurance Company, Defendants.

Theora L. FORESTEL, Administratrix of the Estate of William M. Forestel, Plaintiff,

v.

PENN NAVIGATION COMPANY, Inc., Penn Shipping Company, Inc. and Roe Insurance Company, Defendants.

Civ. A. Nos. 11856, 11857.

United States District Court
E. D. Louisiana,
New Orleans Division.

Nov. 4, 1966.

New Orleans, La., for plaintiff in Civil Action No. 11857.

Ernest N. Morial, Asst. U. S. Atty., for the United States.

Chaffe, McCall, Phillips, Burke, Toler & Hopkins, Leon Sarpy, James G. Burke, Jr., George A. Kimball, New Orleans, La., for Penn Navigation Co., Inc., and Penn Shipping Co., Inc.

AINSWORTH, Circuit Judge:*

These two consolidated suits were filed by separate counsel on behalf of the widow and minor children of William M. Forestel and grow out of his death on January 6, 1961, while he was acting as third officer on board the SS PENN TRANSPORTER.

The first suit was filed against the United States of America under the Federal Tort Claims Act (28 U.S.C. §§ 1346 (b), 2671 et seq.) and charges that the United States Public Health Service Hospital at New Orleans negligently contributed to or caused the wrongful death of Forestel in not properly treating him medically. The second suit was brought under the Jones Act, Death on the High Seas Act and General Maritime Law against Penn Navigation Company, Inc. and Penn Shipping Company, Inc., owners and operators of the ocean freighter SS PENN TRANSPORTER on which decedent Forestel was a member of the crew in the capacity of third mate.

The case was tried without a jury and numerous witnesses testified and voluminous exhibits were offered, resulting in a mass of evidence, much of which is in conflict. Through this maze of statements, depositions, testimony and exhibits, we find the following to be a reasonable narrative of the facts, having in mind that there is great dispute as to much of the substantial evidence, but having heard most of the evidence and carefully reviewed it as well as the evidence taken by deposition:

Roland J. Sternfels, Chester Eggleston, New Orleans, La., for plaintiffs in Civil Action No. 11856.

Kierr & Gainsburgh, Raymond H. Kierr, Eldon E. Fallon, Kent A. Russell,

On December 5, 1960, the crew of the SS PENN TRANSPORTER flew via

* This case was tried before Judge Ainsworth as a district judge prior to taking office as circuit judge.

chartered airliner from New York to Germany to take over the vessel at Lubeck, Germany, which had recently been converted for bulk transport. En route on the plane Forestel as well as others in the crew drank considerable intoxicants. On arrival and for the next two days Forestel spent very little time on the ship and was seen in a hotel bar, again drinking considerably and drunk. The vessel departed Germany for New Orleans, Louisiana, on December 8. Forestel was a little "hung over" and sick in the first few days but straightened out on the voyage because liquor was not available to him at sea. On December 26, the PENN TRANSPORTER arrived at New Orleans. Shore leave was granted to the crew and Forestel resumed his drinking rather continuously and was seen staggering from the effects of drink. The vessel proceeded on to Baton Rouge, Louisiana, on December 30, where it was to load grain, and Forestel resumed his drinking there, as he had been doing in New Orleans. On January 2, 1961, Forestel was admitted as a patient for acute alcoholism in the emergency room of Our Lady of the Lake Hospital at Baton Rouge. Dr. Lloyd P. Champagne interviewed him in his room in the hospital at the time he was deserting the hospital and Forestel told the doctor that he did not need to be in the hospital to get paraldehyde (which had been prescribed for him there); that he could get this drug aboard his ship. Dr. Champagne gave him no prescription on his leaving and believes that Forestel did not leave the hospital with any paraldehyde. Forestel continued to absent himself from the ship, and on January 4, the second mate went ashore, found Forestel in a "gin room" and brought him back to the ship where the chief mate agreed to allow him to sail if he would do his work. On January 5, the PENN TRANSPORTER sailed from Baton Rouge shortly after midnight destined for Haifa, Israel, with a cargo of grain. On this day Forestel stood his regular 8:00 a. m. to 12:00 noon watch, but while doing so, at about 8:45 a. m., the chief officer and the master of the vessel searched his room and found one full pint of whiskey, one partially full point of whiskey, one empty half-pint whiskey bottle and one partially full bottle of Aquavit, which they confiscated. The vessel proceeded down the Mississippi River from Baton Rouge, and on arrival at New Orleans, anchored in the river to receive stores but shore leave was not granted to the crew, the vessel being in port only for several hours, after which it continued down the Mississippi River toward the Gulf of Mexico.

At 7:30 that evening an A. B. (Loukas) went to Forestel's room to arouse him for his regular 8:00 p. m. to 12:00 midnight watch. The chief mate, Clayton, heard the A. B. calling Forestel and getting no answer because he could not be awakened. Clayton went to the room where he observed a whiskey smell, shook Forestel, tapped his face but got no response from him except that he was snoring loudly. The chief mate then instructed the A. B. to forget about trying to arouse Forestel, told him he would take the watch himself and sent the A. B. to inform the bridge that Clayton would substitute for Forestel. They were off Pilottown, Louisiana (in the Mississippi River near its mouth), at the time about to exchange pilots.

At 8:00 p. m., the master, chief mate and second mate went to Forestel's room to check on him, smelled a peculiar odor like ether, which odor the chief mate said they had not detected when he previously went in at 7:30 to arouse him. The ports were opened to air the room and the chief officer took Forestel's pulse, which was rapid, as well as his respiration. Clayton began looking for ether and instead found a 4-ounce bottle of paraldehyde one fourth full which was opened and smelled the same as Forestel's breath. The paraldehyde was in a brown bottle identical to four similar bottles of the same drug which were kept in the ship's medicine chest. Again an attempt was made to arouse Forestel without success. On further search, a partially consumed bottle of whiskey was found in Forestel's bathroom. The mas-

ter and the two mates did not believe then that Forestel was in any danger at all. None of the officers was in any way familiar with the drug paraldehyde.

Immediately thereafter the master directed his radioman, Davidson, to radio telephone the United States Public Health Service Hospital at New Orleans. After the call was begun the chief officer, Clayton, was present and took over the telephone, describing to Dr. Carr of the hospital staff the size of the paraldehyde bottle and how much remained in the bottle. However, the chief officer stated that he did not know how much had been taken by Forestel or over what period of time he had taken it. He also told the doctor that Forestel had been drinking; that his pulse was 100 and respiration 25. Dr. Carr stated that paraldehyde was a drug which was used for persons suffering with acute alcoholism; that he did not believe there was any danger; that they should let Forestel "sleep it off," continue on course, and report further if his condition changed. The master instructed the chief mate, Clayton, to check Forestel periodically to observe his condition. Thus at 8:30 p. m., Clayton checked Forestel's pulse, which was 100 and strong, and respiration 30 and jerky; at 9:00 p. m., his pulse was 100 and strong and respiration 31 and jerky; at 9:30 p. m., his pulse was 100 and strong and respiration 30 and jerky; at 10:00 p. m., his pulse was 81 and strong and respiration 28 and jerky. At 10:15 p. m., Clayton again checked Forestel's pulse, which was 100, respiration 28; while making the check Forestel gave a snort, opened his eyes and quit breathing. It was then about 10:20 p. m. In the meanwhile, the chief mate gave a solid thump over Forestel's heart with his right fist and the heart resumed beating again. Artificial respiration was applied with the aid of the second mate and seventeen minutes later Forestel was breathing on his own and resumed snoring, 30 times to the minute. The chief officer, second mate and steward remained with Forestel and kept close check on his breathing and pulse. The captain, having been notified by the chief officer, ordered the course of the vessel reversed to return to port at 11:03 p. m. and called the Coast Guard; he was advised to keep up artificial respiration and a cutter and a helicopter would be sent immediately. At 11:25 p. m., Forestel's breathing suddenly quit again and he never resumed independent breathing. Artificial respiration was resumed until midnight of January 6, and the vessel, then returning to port, reached the sea buoy at Southwest Pass at the mouth of the Mississippi River where it anchored. At 12:40 a. m., the second mate took over artificial respiration so that the chief mate could prepare the deck for the Coast Guard helicopter's arrival. At 1:10 a. m., the second mate reported that Forestel had stopped breathing again and was hemorrhaging a blackish-looking substance through the mouth; there was no pulse but artificial respiration was continued until 1:52 a. m. when the Coast Guard corpsman came aboard from the Coast Guard vessel CARTIGAN and began mouth-to-mouth resuscitation but could not revive Forestel whose body was removed at 2:30 a. m. by helicopter.

Forestel was both a chronic and acute alcoholic, having begun his drinking career in his late teens. His drinking episodes lasted from two or three days to two weeks at a time. During the past thirteen years he had serious drinking episodes about once each year, and had been hospitalized for alcoholism on four occasions. During the ten-day period from December 26 when the vessel arrived at New Orleans, until January 5 when it sailed from Baton Rouge for Haifa, he performed no duties, being unable to do so because of being drunk. Nevertheless, he was able to stand his 8:00 a. m. to 12:00 noon watch on January 5.

█ The suit against the United States is based on the contention that Dr. Carr should have ordered Forestel's evacuation from the vessel when he was told, shortly after 8:00 p. m. on January

5, that a 4-ounce bottle of paraldehyde with 3 ounces missing had been discovered in Forestel's room. The information given to Dr. Carr was that no one knew how much paraldehyde had been drunk or over what period of time. Indeed, that was true, no one knew, for no one on the vessel saw Forestel from the end of his 12:00 noon watch on January 5 until the A. B. attempted to arouse him at 7:30 p. m. the same evening. The circumstances indicate that he was in his room during this period of time though there is no direct evidence as to his whereabouts. Dr. Carr was further informed by the ship's officers that Forestel did not appear to be in danger. We are unable to say that his medical advice did not meet the standard of care of medical doctors in this area. Diagnosing the condition and prescribing treatment by radio telephone is not easy to do even under the most favorable circumstances. Dr. Carr also told the crew to watch Forestel and report his condition if it worsened. Under the circumstances, we find no liability on the part of the United States and the suit as to it must be dismissed.

■ The suit against the vessel is based in part upon the claim of unseaworthiness for having paraldehyde aboard, though locked in the medicine chest, and available to all the ship's officers who had access to the key to the chest. But plaintiff has failed to show that the paraldehyde which Forestel drank came from the ship's stores. The evidence is strongly to the contrary. Chief Officer Clayton checked the medicine chest immediately after he discovered that Forestel had been drinking paraldehyde and four bottles remained, which was the identical amount which Clayton had inventoried on board the vessel when it was in Lubeck, Germany. At the Coast Guard hearing in March 1961 Clayton testified that the four bottles of paraldehyde were still aboard the vessel. No one knows where Forestel got paraldehyde, but the evidence shows that he was familiar with the drug, having previously used it from time to time

under prescription given him by his Portland, Oregon, physician. On one occasion when Forestel used the drug he had quite an unfavorable reaction which was reported to his physician, so he knew what paraldehyde was and had been warned it should not be taken to excess because it would be dangerous to do so. His physician normally entrusted dispensing of paraldehyde to Mrs. Forestel during Forestel's periods of recuperation from alcoholism because he feared that Forestel might take an overdose. We cannot, therefore, hold the vessel to be unseaworthy simply because it had four bottles of paraldehyde in its medicine chest, especially since there is no evidence that Forestel partook of the ship's supply. Paraldehyde when used properly is a safe sedative and hypnotic; when used to excess, it is usually a fatal drug and exceptionally dangerous.

■ But plaintiff also charges that the crew was guilty of negligent inattention to Forestel by not having him evacuated by the Coast Guard when he was first discovered at 7:30 p. m. in a stupor. The evidence shows that the chief officer thought he was merely drunk at the time and, having witnessed his drinking episodes in the past, did not consider his condition too unusual. However, on examining Forestel again around 8:00 p. m. and detecting the foul odor of what he thought was ether, he discovered the partially empty bottle of paraldehyde and immediately had the captain seek medical advice from the Public Health Hospital at New Orleans. He did not feel then that Forestel was in any danger nor did any other member of the crew who saw him. The medical evidence discloses that this drug, when taken to excess, can cause respiratory arrest which is precisely what happened at 10:15 p. m. when, for the sixth time, the chief officer was taking Forestel's pulse and respiration. The ship's officers were alarmed then about Forestel's condition and called the Coast Guard for a helicopter evacuation of the seaman. The vessel was then in the Gulf of Mexico having proceeded out of the Missis-

sippi River and being then about five miles from the mouth of the river. The evidence is that it would require up to three hours for a round-trip evacuation of the patient to the hospital. The captain ordered the vessel turned about to return to port and anchored it at the sea buoy awaiting medical aid. Through strenuous efforts of the ship's officers Forestel's breathing was resumed, artificial respiration was continued and normal breathing resumed. Plaintiffs make much of the radio operator's drinking on this night. But there is no indication that his condition prevented communications being established with the hospital or Coast Guard. Usually the master and chief officer were present and in attendance when the calls were made. Forestel was never left unattended from the time he initially quit breathing until his death. Dr. Hollis, expert witness for plaintiff, concedes that the crew did everything in their realm to help Forestel and testified that he has no criticism of the crew's actions. We are of like opinion. Perhaps by using hindsight it might now be considered best to have evacuated him from the vessel at 7:30 p. m. when he was first discovered to be unconscious. But on reflection, perhaps it would have been best if Forestel had remained in the hospital in Baton Rouge and allowed the doctors there to take care of his condition rather than attempt this voyage in such condition. No one on the vessel had any knowledge of the use of paraldehyde or its dangerous characteristics and no one knew that Forestel had taken paraldehyde until 8:00 p. m. Even then no one knew how much he had taken and when Dr. Carr of the Public Health Hospital at New Orleans advised that he be allowed to sleep off his condition and that the vessel should proceed, though the crewman should be watched from time to time, the master and chief mate felt within reason that they were acting properly under the circumstances. Repeated checks of Forestel's condition for the next two hours gave them no cause for alarm, for his condition did not worsen until 10:15 p. m. when his breathing first ceased. Then, as rapidly as they were able to do so, they sought evacuation, medical assistance and any other help that was available. This is a sad case involving the death of a seaman who is survived by wife and children, but it follows naturally from his alcoholic background begun before he had attained majority and continuing on down to the time of his death when he was 48 years of age. His alcoholism had been a source of much travail to his wife and came near causing their separation. At the time of his death his body had already begun to deteriorate, particularly the liver, which had a fatty metamorphosis. This coupled with the heavy consumption of whiskey and the excessive drinking of paraldehyde brought about his inevitable death.

██ Under the Jones Act the survivors of a seaman may recover if his death resulted "in whole or in part from the negligence" of respondent. 46 U.S.C. § 688; 45 U.S.C. § 51. The primary question for decision is whether employer fault played any part, even the slightest, in the seaman's mishap. Rogers v. Missouri Pacific Railroad Co., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957). Under the Act contributory negligence of the seaman does not bar recovery but diminishes the damages in proportion to the amount of negligence attributable to the seaman. 45 U.S.C. § 53. Thus the burden is on plaintiffs to prove that the seaman's death resulted in whole or in part from respondent's negligence, Page v. St. Louis Southwestern Railway Company, 5 Cir. 1963, 312 F.2d 84, 98 A.L.R.2d 639; and "Of course the substantive law recognizes that if the negligence of the Employee is the sole cause of the injury or death, there is no liability." Page v. St. Louis Southwestern Railway Co., 5 Cir. 1965, 349 F.2d 820.

██ The principle of causation is thus definitely established both in the Act and in the decisions construing the Act. Respondent's fault, if any, must have played a part in Forestel's death for

there to be recovery here. When Forestel ingested paraldehyde, in some quantity up to 3 ounces (which would have been 15–18 times the normal dose if he took a full 3 ounces), he set into motion the physical forces that brought about his death which was due to excessive dosage of that drug. Having done so, our inquiry is what steps should the ship's crew reasonably have been expected to do under the prevailing circumstances to attempt to save his life. In the beginning they did not know what he had taken. On learning that it was paraldehyde they sought advice from the United States Public Health Service Hospital at New Orleans and Dr. Carr advised that Forestel sleep it off. One or more of the crew were in more or less constant touch with Forestel, checking on his condition. The evidence will not support a finding that they should have known that his condition required evacuation prior to the time they requested it. When his condition worsened they sought help from the Coast Guard. The evidence is conflicting as to the cause of delay in transmitting proper messages to the Grand Isle Coast Guard station, thence to the New Orleans Coast Guard headquarters. We feel, however, that the ship's crew did what reasonable men would have done under the same or similar circumstances, having full regard for the duty of a ship toward members of its crew who become ill at sea. If there was some negligence, or slight negligence, we hold that it was a condition rather than a cause, and that it did not play a part in the seaman's death, which we find was due solely to his own fault. There is no indication that the crew treated his case in a callous manner, or were not concerned about his condition, or that they did not seek medical advice on first observing him in an unconscious condition. The crew of the vessel is held to a duty of reasonable care and in our judgment this was what was given him. Accordingly, the suit must be dismissed as to the vessel's owners.